UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| | : | |
| v. | : | Hon. Lois H. Goodman |
| | : | |
| RANA SHARIF, | : | Mag. No. 20-5013 |
| AWAISE DAR, | : | |
| SHAMSHER FAROOQ, | : | |
| HABIB MAJID, | : | |
| NAVEED ARIF, | : | |
| ALI ABBAS, and | : | |
| ERM AYAZ | : | |

I, Brian Macdonald, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Postal Inspector for the United States Postal Inspection Service, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached page and made a part hereof:

s/ Brian Macdonald
Brian Macdonald
Postal Inspector
United States Postal
Inspection Service

Inspector Macdonald attested to this Complaint
by telephone pursuant to F.R.C.P. 4.1(b)(2)(A)

July 2nd 2020 at 11:25 a.m.      at     District of New Jersey

HONORABLE LOIS H. GOODMAN
UNITED STATES MAGISTRATE JUDGE        Signature of Judicial Officer

**ATTACHMENT A**

Count One
(Conspiracy to Commit Bank Fraud)

From at least as early as March 2018 through in or around April 2020, in the District of New Jersey, and elsewhere, the defendants,

RANA SHARIF,
AWAISE DAR,
SHAMSHER FAROOQ,
HABIB MAJID,
NAVEED ARIF,
ALI ABBAS, and
ERM AYAZ,

did knowingly and intentionally conspire and agree with each other and others to execute a scheme and artifice to defraud financial institutions, as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation, and to obtain monies, funds, assets, and other property owned by and under the custody and control of such financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, Brian Macdonald, am a Postal Inspector with the United States Postal Inspection Service ("USPIS").  I have knowledge about the facts set forth below from my involvement in the investigation, my review of reports, documents, pictures, videos, witness interviews, and discussions with other law enforcement officers.  Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I know concerning this investigation.  All statements described in this criminal complaint are set forth in substance and in part.  In addition, where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

**I.      RELEVANT INDIVIDUALS AND ENTITIES**

1.      At various times relevant to this criminal complaint:

   a.      Defendant RANA SHARIF ("**SHARIF**") resided in or around Dearborn Heights, Michigan.

   b.      Defendant AWAISE DAR ("**DAR**") resided in or around Dearborn, Michigan.

   c.      Defendant SHAMSHER FAROOQ ("**FAROOQ**") resided in or around Dearborn, Michigan.

   d.      Defendant HABIB MAJID ("**MAJID**") resided in or around North Brunswick, New Jersey.

   e.      Defendant NAVEED ARIF ("**ARIF**") resided in or around Port Reading, New Jersey.

   f.      Defendant ALI ABBAS ("**ABBAS**") resided in or around Carteret, New Jersey.

   g.      Defendant ERM AYAZ ("**AYAZ**") resided in or around Bayside, New York.

   h.      "Victim Bank 1," "Victim Bank 2," "Victim Bank 3," and "Victim Bank 4" (collectively, the "Victim Banks"), were "financial institutions," as that term is defined in Title 18, United States Code, Section 20, and offered, among other things, business checking and debit accounts to commercial businesses.

    i. "Merchant Processor 1" and "Merchant Processor 2" were credit and debit card processing companies that provided businesses the equipment (e.g., point-of-sale terminals) to accept electronic payments without the need for cash.

## II. OVERVIEW OF THE CONSPIRACY

  2. Beginning at least as early as March 2018 through in or about April 2020, defendants **SHARIF**, **DAR**, **FAROOQ**, **MAJID**, **ARIF**, **ABBAS**, **AYAZ**, and others (collectively, the "Criminal Organization") conspired with each other and others to defraud, and did defraud, multiple banks whose deposits were insured by the Federal Deposit Insurance Corporation (FDIC).  To accomplish its unlawful objectives, members of the Criminal Organization established bank accounts at retail banks and merchant processing accounts.  Approximately two to three months after establishing these accounts, members of the Criminal Organization engaged in the following activities in furtherance of the conspiracy:

    a. issued checks payable to shell companies associated with the Criminal Organization with no legitimate business activities, knowing that the accounts had insufficient funds, thus taking advantage of the temporary float;[1]

    b. conducted numerous fraudulent credit card and debit card transactions between shell companies to fraudulently credit payee accounts and fraudulently overdraw payor accounts; and/or

    c. used these shell companies to execute temporary refund credits, commonly referred to as "charge-backs," to checking accounts associated with the Criminal Organization, where no prior legitimate transaction had occurred.

  3. In each one of these instances, members of the Criminal Organization withdrew the "existing" funds (through ATMs or bank tellers) that Victim Banks and/or merchant processors had credited to the payee bank accounts at the time of the fraudulent transaction.  Because members of the

---

[1] "Float" is money within the banking system that is briefly counted twice (between two to three days) due to time gaps in the clearing of a deposit or withdrawal.  For instance, in the context of checks, a bank sometimes immediately credits the account of the check payee as soon as a check is deposited.  However, it takes time for the check to clear the payor's bank account.  Until the check clears the account on which it is drawn, the payable amount of the check is recorded in two different places, appearing in the both the recipient's and payor's bank accounts.  As described herein, the same concept was at play here, both with checks issued from the Criminal Organization's accounts, and in the context of electronic payments executed through merchant processors.  With respect to the latter, the timing in which payee accounts were credited allowed the Criminal Organization to withdraw funds credited to a payee bank account before the transaction cleared, and before the Victim Banks could determine that the transaction was fraudulent.

Criminal Organization withdrew the credited funds from the payee accounts before the Victim Banks could recognize the fraudulent transactions, the Victim Banks and merchant processors were left with substantial losses. Indeed, the investigation has identified approximately 200 bank accounts and 75 merchant credit card processing accounts used to facilitate the schemes. The Criminal Organization's unlawful activities have caused an aggregate loss to Victim Banks and merchant processing companies exceeding $3.5 million dollars.

4. Based on my training and experience and what I have learned throughout this investigation, there is probable cause to believe that defendants **SHARIF**, **DAR**, **FAROOQ**, **MAJID**, **ARIF**, **ABBAS**, **AYAZ**, and others agreed to and did engage in the conspiracy. As described herein, the investigation revealed, among other things, the following: (1) members of the Criminal Organization opened multiple shell companies around the same time frame, between 2018 through 2020; (2) some of these accounts were opened with synthetic identities and controlled by common coconspirators; (3) common coconspirators conducted numerous transactions between the shell companies for no legitimate business purpose; and (4) common coconspirators issued multiple fraudulent refund credits between the shell companies without any prior purchase.[2]

5. Law enforcement's investigation has revealed that the Criminal Organization used the accounts described below, as well as other accounts identified during the investigation, to conduct two schemes: (1) to move monies through shell companies to take advantage of payee accounts being immediately credited after fraudulent transactions; and (2) to credit fraudulent refunds to accounts of shell companies when there was no prior legitimate purchase of goods or services. The investigation has revealed evidence demonstrating that the defendants and others engaged in both schemes.

6. For purposes of establishing probable cause to believe that the defendants agreed to and did participate in the conspiracy charged in this criminal complaint, Sections III and IV, below, outline six illustrative, non-exhaustive examples of fraudulent transactions, in which the defendants engaged, and which demonstrate the Criminal Organization's execution of the fraudulent schemes described above.

---

[2] A synthetic identity is the combination of valid personally identifiable information (PII), like valid social security numbers (SSNs), with accompanying false PII, such as names and dates of births. The investigation revealed that many of the accounts opened in furtherance of the conspiracy were opened using synthetic identities.

5

### III.  FRAUDULENT TRANSACTIONS TO CAPITALIZE ON THE FLOAT

7.  Based on my training and experience and the investigation to date, there is probable cause to believe that the entities described herein—including, but not limited to, Shama Catering, MS Car Repair, Reddy Catering, Lahore Fashion Valley, Syed Clothing, Mani Hookah, Michigan Cellphone, Shalimar BBQ and Curry House, Fashium Apparels—were fraudulent shell companies established in furtherance of the conspiracy and which had no legitimate business purpose.  Indeed, the investigation has revealed the following facts, described in more detail below, demonstrating that these entities were shams and had no legitimate purpose: (1) the bank accounts associated with those companies were controlled by individuals other than the listed account holders; (2) the companies did not have a bona fide place of business; (3) the associated bank accounts were involved in numerous transactions and for large sums of money in a short period of time; (4) many of the associated accounts were opened using synthetic identities; and (5) most of the accounts were overdrawn, resulting in millions of dollars in losses to financial institutions.

#### A.  Example 1 – Accounts Held at Victim Bank 1 Controlled by Defendants ABBAS, SHARIF, and DAR

8.  On or about August 2, 2019, at a branch of Victim Bank 1 located in or around Holmesburg, Pennsylvania, four business bank accounts were opened in the names of "Shama Catering" and "MS Car Repair."  Although the accounts were opened in the name of an account holder named Mohammad Shafique,[3] the investigation revealed that these accounts were actually controlled by defendant **ABBAS** (hereafter, the "Shafique Accounts").[4]

9.  Approximately three months after the Shafique Accounts were opened, these accounts were fraudulently debited, over a two-day period, approximately 47 times for approximately $312,418.  Specifically, between on or about November 9, 2019 and November 10, 2019, the Shafique Accounts, through Merchant Processor 1, were debited by two other bank accounts identified as shell entities associated with the Criminal Organization, named "Reddy Catering" (hereafter, the "Reddy Catering VB1 Account") and "Lahore

---

[3] The investigation revealed that Mohammad Shafique is a synthetic identity.

[4] On or about November 12, 2019, security cameras at Victim Bank 1's branch in Jersey City, New Jersey captured **ABBAS**, via ATM, accessing and withdrawing funds from the Shama Catering and MS Car Repair accounts.  Notably, the Shama Catering and MS Car Repair bank account paperwork listed the same United Postal Service ("UPS") box as their business address. UPS records revealed that the box was leased to the synthetic identity Mohammad Shafique. UPS records also show that the passport provided for identification—purported to be Shafique— had a photograph of **ABBAS**.  Moreover, that passport photograph matched the physical appearance of **ABBAS**'s New Jersey driver's license photograph and the individual captured in the ATM security camera footage.

Fashion Valley" (hereafter, the "Lahore Fashion Account"). Defendants **SHARIF** and **DAR** then caused the money credited to the Lahore Fashion Account and the Reddy Catering VB1 Account to be transferred—through wire transfers, checks, and cash deposits and withdrawals—into a bank account held and controlled by defendant **SHARIF** at another third-party financial institution (hereafter, "the SHARIF Account"). Indeed, all of the funds—more than $310,000—from the 47 transactions debited from the Shafique Accounts and credited to either the Lahore Fashion Account or the Reddy Catering VB1 Account ultimately were deposited into the SHARIF Account. The investigation has revealed that once the payments had been credited to the SHARIF Account, defendants **DAR** or **SHARIF** immediately withdrew the funds from the SHARIF Account through ATMs, bank tellers, online transactions, and cashier's and business checks payable to other shell companies associated with the Criminal Organization. Defendants **DAR** or **SHARIF** did so before Victim Bank 1 and Merchant Processor 1 could determine that the transactions were fraudulent.

10. Indeed, on or about November 13, 2019, the third-party financial institution's security cameras captured defendants **DAR** and **SHARIF** together at a branch located in or around Dearborn, Michigan. The security cameras captured defendants **DAR** and **SHARIF** withdrawing approximately $85,000 from the SHARIF Account. Based on the security camera footage, the timing of the withdrawals (three to four days after the 47 debit transactions from the Shafique Accounts had been executed), and other information described herein, there is probable cause to believe that defendants **SHARIF** and **DAR** withdrew $85,000 from the SHARIF Account that had been fraudulently credited initially to the Lahore Fashion Account and the Reddy Catering VB1 Account, and ultimately transferred to the SHARIF Account.

11. There is probable cause to believe that these transactions were not the result of actual services rendered or goods provided, but were instead the product of sham, fraudulent transactions executed in furtherance of the Criminal Organization's unlawful objects. Specifically, the investigation has revealed that the Shafique Accounts (1) were opened with a synthetic identity, and (2) exhibited an unusual amount of transaction activity in a short period of time without the funding to support the transactions. Moreover, during the investigation, law enforcement has identified no actual commercial business conducted by Shama Catering, MS Car Repair, Lahore Fashion Valley, or Reddy Catering, further demonstrating that these are all sham entities created in furtherance of the conspiracy's fraudulent activities.

12. As a result of the fraudulent transactions described herein, the Shafique Accounts ultimately were overdrawn by hundreds of thousands of dollars, resulting in a total loss to Victim Bank 1 of approximately $305,225.

### B. Example 2 – Accounts Held at Victim Bank 2 Controlled by Defendants SHARIF and DAR

13.     On or about October 2, 2019, at a branch of Victim Bank 2 located in or around Sun Valley, California, three other checking accounts were opened in the name of Reddy Catering (collectively, "Reddy Catering VB2 Accounts"). Similar to the Reddy Catering VB1 Account described in Section III.A, above, all debit and credit cards for the account were issued in another account holder's name but were controlled in fact by defendants **SHARIF** and **DAR**. Indeed, on or about November 15, 2019, an ATM security camera from a Victim Bank 2 branch in or around Garden City, Michigan, captured defendant **DAR** depositing approximately $7,000 into one of the Reddy Catering VB2 Accounts using an associated debit card. On the same day, approximately $7,000 was debited from the same account via online transfer.

14.     Approximately three days later, on or about November 18, 2019, at a branch of Victim Bank 2 located in or around Dearborn, Michigan, security cameras captured defendant **DAR** depositing approximately $5,000 into one of the Reddy Catering VB2 Accounts. Additionally, a Victim Bank 2 ATM security camera captured defendant **DAR** driving a Silver Chevy Silverado with defendant **SHARIF** in the front passenger's seat. The same day, defendant **SHARIF** made a $40 deposit to the same Reddy Catering VB2 Account using the issued debit card.

15.     Accordingly, there is probable cause to believe that defendants **SHARIF** and **DAR** exercised dominion and control over the Reddy Catering VB2 Accounts. Further, there is probable cause to believe that defendants **SHARIF** and **DAR** deposited relatively small amounts into the Reddy Catering VB2 Accounts as described above, as a method to avoid detection from Victim Bank 2, and that they made these small deposits to create the appearance of legitimate business activity, when, in fact, defendants **SHARIF** and **DAR** established the accounts for the ultimate purpose of overdrawing them in furtherance of the conspiracy.

16.      Thereafter, from on or about November 18, 2019 to on or about November 19, 2019, defendants **SHARIF**, **DAR**, and other coconspirators used the Lahore Fashion Account described above to debit, through Merchant Processor 2, substantial amounts from the Reddy Catering VB2 Accounts. Specifically, financial records revealed that the Lahore Fashion Account debited Reddy Catering VB2 Accounts approximately 98 times over that two-day period. This caused the Reddy Catering VB2 Accounts to be overdrawn by approximately $426,326.38. Significantly, as with the fraudulent transactions described in Section III.A, above, the funds debited from the Reddy Catering VB2 Accounts and credited to the Lahore Fashion account were ultimately deposited into the SHARIF Account.

8

17. The investigation revealed that in a matter of days, defendants **SHARIF** and **DAR** withdrew the funds from the SHARIF Account through ATMs, bank tellers, and money orders, and that they charged amounts at various commercial establishments.[5] During this same time period, the SHARIF Account also issued approximately $200,000 in checks made payable to AD Catering, LLC, another shell entity associated with the Criminal Organization that listed defendant **DAR** as the account holder. Bank records revealed that most of these checks were deposited into the AD Catering, LLC bank account.

18. There is probable cause to believe that these transactions conducted by defendants **DAR** and **SHARIF** were fraudulent for the following reasons: (1) defendants **SHARIF** and **DAR** controlled multiple accounts opened using synthetic identities or held in the names of other individuals; (2) large amounts of money were deposited and then withdrawn from the payee accounts within a short period of time; (3) defendants **SHARIF** and **DAR** continued to overdraw the subject accounts for hundreds of thousands of dollars; and (4) fraudulent funds were ultimately deposited into accounts listing **SHARIF** or **DAR** as the account holder.

19. As a result of the fraudulent transactions described herein, the Reddy Catering VB2 Accounts were overdrawn by hundreds of thousands of dollars, resulting in a total loss to Victim Bank 2 of approximately $426,326.

### C. Example 3 – Accounts Held at Victim Bank 2 and Victim Bank 3 Controlled by Defendant FAROOQ

20. In or around March 2020, law enforcement identified defendant **FAROOQ** as a member of the Criminal Organization. There is probable cause to believe that defendants **DAR** and **FAROOQ** used shell entities in furtherance of the conspiracy, including but not limited to: (a) Syed Clothing, LLC ("Syed Clothing"); (b) Mani Hookah Supplies, LLC ("Mani Hookah"); and (c) Michigan Cellphone, LLC ("Michigan Cellphone"). As detailed below, the investigation has revealed that these shell entities were controlled by defendants **DAR** and **FAROOQ**. Moreover, the investigation has revealed that these shell entities served no legitimate business purpose.

21. On or about December 23, 2019, at a branch of Victim Bank 3 located in or around Edison, New Jersey, two checking accounts were opened in the name of Syed Clothing, with a purported location in Westville, New Jersey, with "Account Holder-1," listed as the signor, at the same address (hereafter, "Syed Clothing NJ"). On or about January 9, 2020, at a branch of Victim Bank

---

[5] On multiple occasions, bank security cameras captured **SHARIF** and **DAR** using the SHARIF Account to execute transactions in furtherance of the Criminal Organization's fraudulent scheme.

9

3 located in or around Crossroads, Virginia, three additional checking accounts were opened in the name of Syed Clothing, with a purported location in Reston, Virginia, also with Account Holder-1 listed as the signor ("Syed Clothing VA"). (The accounts for Syed Clothing NJ and Syed Clothing VA are collectively referred to as the "Syed Clothing Accounts").

22. On or about February 7, 2020, a business account named Mani Hookah was opened at a branch of Victim Bank 2 located at Garden City, Michigan (the "Mani Hookah Account"). Mani Hookah's stated location was in Garden City, Michigan, and listed two account signors, "Account Holder-2," residing in or around West Bloomfield, Michigan, and defendant **FAROOQ**, residing in or around Dearborn, Michigan. The account opening paperwork for the Mani Hookah Account listed defendant **FAROOQ**'s purported address as a residence that the investigation revealed to be defendant **DAR**'s residence (the "**DAR** Residence"). The investigation also revealed that Account Holder-2 traveled to Pakistan from the United States in or about February 2020 and has not returned.

23. On or about February 18, 2020, a business account of Victim Bank 2 named Michigan Cellphone, LLC (the "Michigan Cellphone Account") was opened with a listed address as the **DAR** Residence. The account paperwork listed defendant **FAROOQ** as the account signor residing at the same address. In light of defendant **FAROOQ**'s control over them, the Michigan Cellphone Account and the Mani Hookah Account are referred to collectively as the "FAROOQ Accounts").

24. From on or about March 31, 2020 through on or about April 3, 2020, approximately $26,330 was wired into the Syed Clothing Accounts from multiple shell entities associated with the Criminal Organization, including the Mani Hookah Account (one of the FAROOQ Accounts controlled by defendant **FAROOQ**). Bank records revealed that aside from small initial deposits, all of the funds in the Syed Clothing Accounts originated from other shell entities associated with the Criminal Organization. Particularly in light of the fraudulent activities of the Criminal Organization's shell entities, this is highly suspicious and inconsistent with normal business practice.

25. Between on or about March 31, 2020 and on or about April 10, 2020, approximately $38,280 was wired from the Syed Clothing Accounts to multiple shell entities, including the Michigan Cellphone Account (one of the FAROOQ Accounts controlled by defendant **FAROOQ**). During the same time, the Syed Clothing Accounts were fraudulently debited approximately 24 times for amounts totaling approximately $68,723, and ultimately the Syed Clothing Accounts were overdrawn by tens of thousands of dollars. Specifically, the debits originated from the FAROOQ Accounts (the Michigan Cellphone and Mani Hookah Accounts controlled by defendant **FAROOQ**), and AD Catering, LLC. The

investigation revealed that these transactions were not the result of actual services rendered or goods provided, but were instead the product of sham, fraudulent transactions by associated entities linked to the Criminal Organization.

26. For instance, between on or about April 2, 2020 and April 9, 2020, the Syed Clothing Accounts were debited by the FAROOQ Accounts multiple times. Immediately after these transactions, **FAROOQ** and other members of the Criminal Organization began withdrawing funds from the accounts belonging to the shell entities, including the FAROOQ Accounts. As just two examples:

    a. On or about April 3, 2020, Victim Bank 2 security cameras captured defendant **FAROOQ** using the debit cards associated with the FAROOQ Accounts at a branch located in or around Dearborn Heights, Michigan. On that date, defendant **FAROOQ** withdrew approximately $3,000.

    b. On or about April 14, 2020, Victim Bank 2 security cameras captured defendant **FAROOQ** using the debit cards associated with the FAROOQ Accounts at a branch located in or around Dearborn Heights, Michigan. On that date, **FAROOQ** withdrew approximately $5,000.

27. Based on the Criminal Organization's fraudulent transactions during this time period, Victim Bank 3 lost a total of approximately $53,827.

### D. Example 4 – Account Held at Victim Bank 4 Controlled by Defendant MAJID.

28. In or around December 2019, law enforcement identified defendant **MAJID** as a member of the Criminal Organization. The investigation revealed that defendant **MAJID** utilized shell companies incorporated in New Jersey and elsewhere to issue checks payable to other shell companies. The investigation also revealed that defendant **MAJID** and others knew that the accounts had insufficient funds and overdrew the accounts to take advantage of the temporary funds credited to the payee accounts. Set forth below are illustrative examples that demonstrate defendant **MAJID**'s involvement in the Criminal Organization's fraudulent activities.

29. On or about October 9, 2019, the business accounts in the names of Zizer Apparels, Inc. and Haveli Catering, Inc. (hereafter, the "Bhatti Accounts") were opened through an international-based bank with a local branch located in or around Iselin, New Jersey, under the name Sajid S. Bhatti.[6]

---

[6] The investigation revealed that Sajid S. Bhatti is a synthetic identity.

30. The investigation revealed that the Bhatti Accounts: (1) were opened with a synthetic identity; (2) issued approximately 23 checks totaling approximately $203,581 within a week of being opened; (3) did not have sufficient funds to cover the payable amounts of the checks at that time; and (4) issued checks payable to shell companies associated with the Criminal Organization. There is probable cause to believe that the Bhatti Accounts (Zizer Apparels, Inc. and Haveli Catering, Inc.) were opened in the name of these shell companies associated with the Criminal Organization, which have no legitimate purpose.

31. Based on financial records and the investigation to date, there is probable cause to believe that defendant **MAJID** fraudulently presented checks drawn on the Bhatti Accounts knowing that the Bhatti Accounts did not have the funds to cover the payable amounts of the checks. Specifically, between on or about October 9, 2019 and on or about October 16, 2019, the Bhatti Accounts made checks payable to multiple entities, including, but not limited to Crummi, Inc., Single Bite Catering, MS Car Repair, and Shama Catering, all shell entities associated with the Criminal Organization.

32. There is probable cause to believe that the accounts opened at Victim Bank 4 in the names of Crummi, Inc. and Single Bite Catering were controlled by defendant **MAJID** (hereafter, the "MAJID Accounts"). The investigation revealed that defendant **MAJID** controlled the MAJID Accounts. Specifically: (1) the MAJID Accounts listed defendant **MAJID**'s residential address as the place of business for the associated companies; and (2) defendant **MAJID** was captured on Victim Bank 4 security cameras withdrawing funds from the MAJID Accounts immediately after they had been credited.

33. Specific examples of defendant **MAJID**'s control over the MAJID Accounts and his withdrawal of funds fraudulently credited to those accounts are set forth below:

   a. On or about October 11, 2019, a Victim Bank 4 ATM security camera captured defendant **MAJID** using debit cards associated with the MAJID Accounts at a branch located in Woodbridge, New Jersey. On that date, defendant **MAJID** withdrew approximately $240.

   b. On or about October 12, 2019, Victim Bank 4 ATM security camera captured defendant **MAJID** using debit cards associated with the MAJID Accounts at a branch located in Somerville, New Jersey. On that date, defendant **MAJID** deposited a check issued from the Bhatti Accounts in the amount of approximately $8,944. Notably, bank security camera also captured defendant **ARIF** in the front passenger seat of **MAJID**'s known vehicle.

34. On that same date, in the same branch location, Victim Bank 4 ATM security camera captured defendant **MAJID** driving his known vehicle and defendant **ARIF** as his passenger. At that time, defendant **MAJID** deposited two checks issued from the Bhatti Accounts in the amount of approximately $8,699.47 and $7,994.23, respectively, into the MAJID Accounts.

35. As a result of the fraudulent transactions described herein, the BHATTI Accounts were overdrawn by hundreds of thousands of dollars, resulting in a total loss to Victim Bank 4 of approximately $338,390.

## IV.    FRAUDULENT REFUND CREDIT TRANSACTIONS

36. During the investigation, law enforcement identified defendants **ARIF**, **ABBAS**, **MAJID**, **AYAZ**, and others as members of the Criminal Organization who utilized shell companies incorporated in New Jersey and elsewhere to defraud financial institutions through a fraudulent refund credit scheme in furtherance of the conspiracy.

37. In the refund credit scheme executed in furtherance of the conspiracy, members of the Criminal Organization, including defendants **ARIF, ABBAS, MAJID,** and **AYAZ** caused merchant accounts established for shell entities to transfer money to other accounts as part of purported refunds for goods purchased or services provided. These refund credit transactions, as relevant to this criminal complaint, allowed a purported merchant account to give the appearance of a legitimate refund credit to another shell entity, but without any intention of actually transferring the funds. To execute a refund credit transaction, the refunding merchant must complete a two-step process. First, the merchant must "authorize" the refund credit into the intended credited account. The authorization will show the funds as "pending" status in the credited account. Second, within two days of authorization, the merchant must "post," or actually transfer, the refund credit amount into the credited account. While the funds are in "pending" status, they are made available for withdrawal from the credited account.

38. The investigation revealed that members of the Criminal Organization, including defendants **ARIF**, **ABBAS, MAJID,** and **AYAZ** caused shell entities to authorize fraudulent refund credits to bank accounts for other shell entities; however, a review of relevant bank records revealed that there had been no prior debits reflecting goods purchased or services rendered that would ever make a refund necessary. Once the fraudulent refund credit transactions had been initiated, members of the Criminal Organization would then withdrew funds from the credited accounts while the refund credits were in "pending" status. Once the withdrawals were made from the credited accounts, the refunding merchants account would then cancel the authorizations, thus terminating the transactions. As a result, the credited accounts were overdrawn because the funds were never posted in the account. Accordingly, there is probable cause to

13

believe that the funds initially credited to the refunded account were non-existent, sham transactions that served only to permit the coconspirators to withdraw credited funds before victim banks could identify the fraudulent nature of the transactions.

### A. Example 5 – Accounts Held at Victim Bank 3 Controlled by Defendants ARIF and MAJID.

39. The following are examples that demonstrate control of Victim Bank 3 accounts by defendants **ARIF** and **MAJID** in furtherance of the conspiracy, and their participation in the conspiracy's fraudulent refund credit scheme.

40. In or around October 2019 and November 2019, the following business accounts were opened at a branch of Victim Bank 3 located in or around Morristown, New Jersey, under the name Sajjad Hussain[7]:

(i) Burger Slap;
(ii) Shalimar BBQ & Curry House (hereafter, "Shalimar BBQ"); and
(iii) SH Garden.

As detailed below, the investigation revealed that defendant **ARIF** controlled these accounts (hereafter, the "ARIF Accounts").

41. In or around November 19, 2019, the following business accounts were opened at a Victim Bank 3 branch located in or around Wharton, New Jersey under the name Shokat Ali[8]:

(i) Pizak Pizza, Inc.; and
(ii) Fashium Apparels.

As detailed below, the investigation revealed that defendant **MAJID** controlled these accounts (hereafter, the "MAJID Accounts II").

42. The investigation revealed that defendants **ARIF** and **MAJID** controlled the ARIF Accounts and the MAJID Accounts II, respectively. Specifically, on or about November 15, 2019, a Victim Bank 3 security camera captured defendants **ARIF** and **MAJID** inside a branch located in or around Morristown, New Jersey. The date and time stamp coincided with the date, time, and place that the Shalimar BBQ and SH Garden accounts (two of the ARIF

---

[7] The investigation revealed that Sajjad Hussain is a synthetic identity that defendant **ARIF** used to open multiple bank accounts in furtherance of the conspiracy.

[8] The investigation revealed that Shokat Ali is a synthetic identity.

Accounts) were opened at that branch. Further investigation revealed that the address listed for the ARIF Accounts was associated with defendant **MAJID**.

43. A review of financial records revealed that, between on or about December 7, 2019 and on or about December 9, 2019, (1) the MAJID Accounts II received fraudulent refund credits from a Shalimar BBQ merchant account totaling approximately $30,000; and (2) the ARIF Accounts received fraudulent refund credits from a Shalimar BBQ merchant account totaling approximately $22,500.

44. The investigation revealed that these refunds were fraudulent and not predicated on actual prior purchases, based on the following: (1) the ARIF Accounts and MAJID Accounts II were opened with synthetic identities; and (2) a review of bank records revealed that there were no corresponding credits to the Shalimar BBQ account indicative of actual purchases or services. Accordingly, there is probable cause to believe that the refund credits were fraudulent because there were no prior transactions to refund. Furthermore, law enforcement's review of financial records revealed that the fraudulent refunds were immediately withdrawn upon being credited to the ARIF Accounts and MAJID Accounts II while they remained in "pending" status.

45. Additional examples of defendant **ARIF**'s control over the ARIF Accounts and his withdrawal of funds fraudulently refunded to those accounts are set forth below:

   a. On or about December 7, 2019, a Victim Bank 3 ATM security camera captured defendant **ARIF** using debit cards associated with the ARIF Accounts at a branch located in Woodbridge, New Jersey. On that date, defendant **ARIF** withdrew approximately $2,400.

   b. On or about December 8, 2019, a Victim Bank 3 ATM security camera captured defendant **ARIF** using debit cards associated with the ARIF Accounts at a branch located in Iselin, New Jersey. On that date, defendant **ARIF** withdrew approximately $2,400.

   c. On or about December 9, 2019, a Victim Bank 3 ATM security camera captured defendant **ARIF** using debit cards associated with the ARIF Accounts at a branch located in Iselin, New Jersey. On that date, defendant **ARIF** withdrew approximately $2,400.

   d. Between on or about December 7, 2019 and 9, 2019, additional illicit funds were withdrawn via post office money order purchases totaling approximately $6,163, and transactions were executed at a retail store totaling approximately $5,829, from the ARIF Accounts. On or about December 7, 2019, a post office security camera located in Woodbridge, New Jersey, captured defendant **ARIF** purchasing approximately $1,000 in money orders.

Victim Bank 3 records revealed that defendant **ARIF** also used one of the ARIF Accounts (specifically, SH Garden) to purchase the money orders.

46. Additional examples of defendant **MAJID**'s control over the MAJID Accounts II and his withdrawal of funds fraudulently credited to those accounts are set forth below:

   a. On or about December 7, 2019, Victim Bank 3 ATM security cameras captured defendant **MAJID** using debit cards associated with the MAJID Accounts II at branches located in Newark, New Jersey and Union, New Jersey. On that date, defendant **MAJID** withdrew approximately $1,600 from the MAJID Accounts II at each branch location.

   b. Between on or about December 7, 2019 and on or about December 9, 2019, additional funds were withdrawn from the MAJID Accounts via post office money order purchases totaling approximately $10,013 and via transactions at a retail store totaling approximately $15,358. Indeed, on or about December 7, 2019, a post office security camera located in Garwood, New Jersey, captured **MAJID** purchasing approximately $1,000 in money orders. Victim Bank 3 records revealed that **MAJID** used one of the MAJID Accounts II (specifically, Fashium Apparels) to purchase the money orders.

47. As a result of the fraudulent refunds credited to the ARIF Accounts and the MAJID Accounts II in furtherance of the conspiracy and as described above, Victim Bank 3 suffered losses of approximately $49,781.

   **B. Example 6 – Accounts Held at Victim Bank 3 Controlled by Defendants AYAZ and ABBAS.**

48. During the investigation, law enforcement identified defendants **ABBAS** and **AYAZ** as additional members of the Criminal Organization who participated in both the fraudulent float transactions described in Section III, above, and the fraudulent refund credit transactions described in this Section IV. In furtherance of the conspiracy, defendants **ABBAS** and **AYAZ** fraudulently used a voluminous amount of bank accounts opened at Victim Bank 3, examples of which are described below.

49. On or about May 30, 2019, business accounts in the names Tandor Grill, Inc. and Fashion Chirp were opened at a branch of Victim Bank 3 located in or around Woodbridge, New Jersey, under the synthetic identity Sajjad Hussain. As detailed herein, the investigation revealed that defendant **ABBAS** controlled these accounts (hereafter, the "ABBAS Accounts").

50. On or about November 19, 2019 and November 27, 2019, business accounts in the names of NR Landery Landscaping, Inc. and NR Hardware

Supplies and Tools, Inc., respectively, were opened at a branch of Victim Bank 3 located in Edison, New Jersey, under the synthetic identity Nadeem Raja. As detailed herein, the investigation revealed that defendant **AYAZ** controlled these accounts (hereafter, the "AYAZ Accounts").[9]

51. Law enforcement's review of bank records for the ABBAS Accounts and the AYAZ Accounts revealed a substantial number of transactions between and amongst each other, which were inconsistent with any legitimate commercial or business activity. Instead, the banking activity between and among the ABBAS Accounts and the AYAZ Accounts were consistent with fraudulent refund credit transactions between the accounts, followed by prompt withdrawals from the credited accounts before Victim Bank 3 could detect the fraudulent nature of the transactions.

52. There is probable cause to believe that the ABBAS Accounts and the AYAZ Accounts were shell companies created and were used in furtherance of the conspiracy, and that they were controlled by defendants **ABBAS** and **AYAZ**, respectively, for the following reasons: (1) the ABBAS Accounts and the AYAZ Accounts were opened with synthetic identities; (2) defendants **ABBAS** and **AYAZ** were not listed as authorized users for the accounts that they controlled in fact; (3) the shell entities did not have bona fide places of business; (4) most of the financial transactions in the ABBAS Accounts and the AYAZ Accounts were with each other or with other shell entities associated with the Criminal Organization; and (5) defendants **ABBAS** and **AYAZ** were captured on bank security camera footage withdrawing funds from the ABBAS Accounts and the AYAZ Accounts, respectively.

53. Between on or about October 26, 2019 through on or about October 29, 2019, the ABBAS Accounts received temporary refund credits, in the manner described in Section IV.A, above, from other shell entities associated with the Criminal Organization in the amount of approximately $37,725.

54. Examples of defendant **ABBAS**'s control over the ABBAS Accounts and his withdrawal of funds fraudulently credited to those accounts are set forth below:

    a. On or about October 28, 2019, Victim Bank 3 security cameras captured defendant **ABBAS** using the debit cards associated with the ABBAS Accounts at a branch located in or around Iselin, New Jersey. On that date, defendant **ABBAS** withdrew approximately $1,600 from the accounts.

    b. On or about October 28, 2019, Victim Bank 3 security cameras captured defendant **ABBAS** using the debit cards associated with the

---

[9] Notably, on November 19, 2019, a Victim Bank 3 branch security camera captured an individual believed to be **ABBAS** opening the NR Landscaping accounts.

17

ABBAS Accounts at a branch located in Edison, New Jersey. On that date, defendant **ABBAS** withdrew an additional $1,600 from the accounts.

      c.    On or about October 29, 2019, Victim Bank 3 security cameras captured defendant **ABBAS** using the debit cards associated with the ABBAS Accounts located in Iselin, New Jersey. On that date, defendant **ABBAS** withdrew approximately $1,000 from the accounts.

55.    As a result of the fraudulent refunds credited to the ABBAS Accounts in furtherance of the conspiracy and as described above, Victim Bank 3 suffered losses of approximately $19,965.

56.    Between on or about December 7, 2019 through on or about December 9, 2019, the AYAZ Accounts received temporary refund credits, in the manner described in Section IV.A, above, from an account associated with Shalimar BBQ (*i.e.*, one of the ARIF Accounts) in the amount of approximately $32,500.[10]

57.    Examples of defendant **AYAZ**'s control over the AYAZ Accounts and her withdrawal of funds fraudulently credited to those accounts are set forth below:

      a.    On or about December 7, 2019, Victim Bank 3 security cameras captured defendant **AYAZ** using the debit cards associated with the AYAZ Accounts at a branch located in or around Bayside, New York. On that date, defendant **AYAZ** withdrew approximately $4,200 from the accounts.

      b.    On or about December 8, 2019, Victim Bank 3 security cameras captured defendant **AYAZ** using the debit cards associated with the AYAZ Accounts at a branch located in Bayside, New York. On that date, defendant **AYAZ** withdrew approximately $4,000 from the accounts.

      c.    On or about December 9, 2019, Victim Bank 3 security cameras captured defendant **AYAZ** using the debit cards associated with the AYAZ Accounts located in Bayside, New York. On that date, defendant **AYAZ** withdrew approximately $8,000 from the accounts.

58.    As a result of the fraudulent refunds credited to the AYAZ Accounts in furtherance of the conspiracy and as described above, Victim Bank 3 suffered losses of approximately $32,423.

---

[10] As noted above, around the same time, both the MAJID Accounts II and ARIF Accounts received fraudulent refund credits from the Shalimar BBQ merchant account totaling approximately $52,500.

59. For the reasons set forth in this Section IV, there is probable cause to believe that the ARIF, MAJID, ABBAS, and AYAZ Accounts described above were associated with shell companies with no legitimate business activities, and were maintained and used by members of the Criminal Organization in furtherance of the conspiracy. As set forth above, this belief is supported by the following: (1) the use of synthetic identities by defendants **ARIF**, **MAJID**, and others to open these accounts; (2) the same synthetic identity (Sajjad Hussain) was listed as the account holder for both the ARIF Accounts and the ABBAS Accounts; (3) the amount of refund credit or "charge backs" to the ARIF, MAJID, ABBAS and AYAZ Accounts without any bank records showing corresponding credits to the account of the refunding entity which would be indicative of a legitimate purchase, resulting in a significant loss to most accounts; and (4) the speed with which defendants **ARIF**, **MAJID**, **ABBAS,** and **AYAZ** withdrew the fraudulent refund credits once they had been credited to the pertinent accounts.

## V. Losses to the Victim Banks

60. As a direct result of the Criminal Organization's fraudulent activities, Victim Bank 1, Victim Bank 2, Victim Bank 3, and Victim Bank 4, financial institutions whose deposits each were insured by the Federal Deposit Insurance Corporation, suffered substantial financial losses totaling more than $1,010,058. In addition, merchant processors also suffered losses of approximately $1,250,000 as a result of the conspiracy's fraudulent scheme.